## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| MOON GROUP, INC., et al., | ) | Case No. 21-11140 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| DON A. BESKRONE, CHAPTER 7 TRUSTEE | ) | |
| FOR MOON GROUP, INC., et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 21-51176 (JKS) |
| | ) | |
| KORE CAPITAL CORPORATION, | ) | **Related Adv. D.I. 26, 36, 40, 49, 53 and 54** |
| | ) | |
| Defendant. | ) | |
| | ) | |

### <u>OPINION</u>[1]

Before the Court is the motion (the "<u>Motion</u>") of Defendant KORE Capital Corporation

("<u>Kore</u>") for judgment on the pleadings.[2]  This dispute concerns the Moon Entities' amended

complaint (the "<u>Amended Complaint</u>") asserting claims arising out of the prepetition line of credit

extended by Kore to the debtors.  Approximately 14 months after entry into the line of credit, Kore

ceased to advance funds thereunder, allegedly resulting in the debtors' inability to fulfill customer

---

[1] "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 or 56 or, unless these rules provide otherwise, on any other motion." Fed. R. Civ. P. 7052(a)(3); Fed. R Bankr. P. 7052.  Accordingly, the Court makes no findings of fact and conclusions of law.

[2] Capitalized terms not defined herein shall have the meaning ascribed to them *infra*.

contracts or continue to operate their businesses.[3] Kore had broad contractual authority to withhold advances. Consequently, Counts I-VI and Count VIII in the Amended Complaint are barred as a matter of law, and judgment on the pleadings will be entered in favor of Kore on those counts. However, Count VII is plausible and the Motion will be denied as to Count VII.

## JURISDICTION

This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue in the United States Bankruptcy Court for the District of Delaware was proper as of the Petition Date (defined below) pursuant to 28 U.S.C. §§ 1408 and 1409 and continues to be so in the context of this adversary proceeding.

## BACKGROUND

### A.    The Bankruptcy Cases

The above-captioned debtors (the "Debtors" or the "Moon Entities"), Moon Group, Inc., Moon Landscaping, Inc., Moon Nurseries, Inc., Moon Site Management, Inc., Moon Wholesale, Inc., and Rickert Landscaping, Inc. filed voluntary chapter 11 petitions on August 12, 2021 (the "Petition Date"). The cases are jointly administered.

The Court entered an order (the "Conversion Order") converting the Moon Entities' cases to cases under chapter 7 effective as of February 11, 2022, except that of Moon Nurseries, Inc.[4] Don A. Beskrone was appointed chapter 7 trustee of the Moon Entities, except for Moon Nurseries,

---

[3] The parties entered into the Revolving Credit Agreement on May 15, 2020; and by mid-July 2021, Kore stopped advancing funds under the Line of Credit.

[4] D.I. 530, entered on February 9, 2022.

Inc., of which Mr. Beskrone was appointed the chapter 11 trustee.[5]  On March 22, 2022, the Court converted the case of Moon Nurseries, Inc. to a case under chapter 7, and Mr. Beskrone was reappointed as chapter 7 trustee for that case (in all his roles, Mr. Beskrone is referred to as the "Trustee").[6]

## B.    Procedural History of Adversary Proceeding

The Moon Entities commenced this action on September 22, 2021, by filing a complaint,[7] which was later amended.[8]  The Amended Complaint includes the following claims: (i) breach of contract, (ii) breach of implied duty of good faith and fair dealing, (iii) tortious interference with contract, (iv) common law fraud, (v) fraudulent misrepresentation, (vi) promissory estoppel, and (vii) violation of the automatic stay.[9]  Prosecution of the Amended Complaint was assumed by the Trustee upon conversion of the cases to cases under chapter 7.

---

[5]  D.I. 541 and 548.

[6]  D.I. 607; Del. Bankr. 21-11142, D.I. 44.

[7]  Adv. D.I. 1.

[8]  Adv. D.I. 12, filed on October 26, 2021 (the "Amended Complaint").

[9]  This adversary action is now being pursued by the chapter 7 Trustee (the "Trustee" or the "Moon Entities").

On March 2, 2022, Kore filed the Motion[10] seeking judgment on the pleadings on all eight counts of the Amended Complaint.  The Motion is fully briefed.[11]  The Court heard oral argument on the Motion on September 21, 2022.[12]

### C.     Factual Background Related to Adversary Action[13]

Moon Group, Inc., a Delaware holding corporation, wholly owns each of the other Moon Entities, which are its operating subsidiaries.  Moon Landscaping, Inc. operated as a landscape and hardscape contractor for the design and installation of residential, commercial, and municipal projects.  Moon Nurseries, Inc. operated a nursery growing, marketing, and selling numerous varieties of field grown or container trees, shrubs, and perennial plants from two farms comprising nearly 900 acres.  Moon Site Management, Inc. ("Moon Site Management") provided traditional recurring grounds management services such as grass cutting, landscape maintenance, ground cover management, tree care, irrigation systems, and snow removal to large commercial properties, apartment complexes, cemeteries, condominium associations, institutions, industrial sites, and residential communities throughout the mid-Atlantic region of the United States.  Debtors Moon Wholesale, Inc. and Rickert Landscaping, Inc. were not operating as of the Petition Date.

---

[10]  Adv. D.I. 26.

[11]  Adv. D.I. 36 (Plaintiff's Memorandum of Law in Opposition to Kore Capital Corporation's Motion for Judgment on the Pleadings); Adv. D.I. 40 (Reply to Plaintiffs' Memorandum in Opposition of Kore Capital Corporation's Motion for Judgment on the Pleadings); Adv. D.I. 49 (Plaintiffs' Sur Reply Letter Brief in Further Opposition to Defendant Kore Capital Corporation's Motion for Judgment on the Pleadings); Adv. D.I. 53 (Kore Capital Corporation's Letter Brief in Response to Plaintiff's Sur-Reply Letter); and Adv. D.I. 54 (Amended Notice of Completion of Briefing Regarding Defendant Kore [Capital] Corporation's Motion for Judgement on the Pleadings).

[12]  Citations to the transcript will be noted as: Adv. D.I. 78 (Tr. of Hr'g (Sept. 21, 2022) at page:line).

[13]  The Court accepts all well-pleaded allegations in the Amended Complaint as true.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  All facts herein are taken from the Amended Complaint, unless otherwise noted.

4

The Moon Entities serviced large commercial contracts, primarily on a seasonal basis. Given this kind of work, the Moon Entities carried substantial accounts receivable, which from time to time, resulted in cash flow shortages when awaiting remittances from customers.

Although the Moon Entities had two secured loan facilities,[14] the cyclical cash flow needs as a result of the seasonality of their businesses necessitated additional liquidity.  On May 15, 2020, the Moon Entities entered into and executed the Revolving Credit and Security Agreement (the "Revolving Credit Agreement").[15]  Under the Revolving Credit Agreement, Kore was to advance funds to the Moon Entities based on invoices issued by the Moon Entities to their customers for services rendered.  The Revolving Credit Agreement, along with all the loan modifications thereto,[16] are collectively referred to as the "Line of Credit."  The Line of Credit was secured by a security interest in the Moon Entities' accounts receivable and is personally guaranteed by John D. Pursell, the long-term operator and former chief executive officer of the Moon Entities.[17]

---

[14]  Two lenders have made loans that are secured by the Moon Entities' real property, inventory, and equipment: Newtek Small Business Finance, LLC extended a commercial loan in the original principal amount of $5 million pursuant to a loan and security agreement dated June 27, 2019, and North Avenue Capital, LLC extended a commercial loan in the original principal amount of $10 million pursuant to a loan and security agreement dated June 28, 2019.

[15]  Adv. D.I. 12 (Amended Complaint), at Ex. 1.

[16]  *See* Adv. D.I. 26 (Defendant Kore Capital Corporation's Memorandum of Law in Support of Motion for Judgment on the Pleadings), Ex. 1 (Loan Modification Agreement, dated Sept. 16, 2020; Second Loan Modification Agreement, dated May 24, 2021; Forbearance/Loan Modification Agreement, dated December 20, 2020; and Waiver/Loan Modification Agreement, dated June 28, 2021).

[17]  Kore had no security interest in the Moon Entities' real estate, inventory, or equipment prior to the Petition Date. The Moon Entities granted Kore junior replacement liens in their real property, inventory, and equipment pursuant to the Final Cash Collateral Order dated September 15, 2021. D.I. 164.

Under the Line of Credit, Kore initially agreed to advance the Moon Entities 80 percent of the receivables for customers other than StoneMor, Inc. ("StoneMor"),[18] Moon Site Management's largest customer, and 35 percent of the StoneMor receivables.  The Line of Credit contemplates that the Moon Entities' receivables would be paid by customers directly to Kore.  In turn, Kore would advance funds (not exceeding the above-noted percentages) to meet the Moon Entities' short-term cash flow needs.

After entering into the Line of Credit, the Moon Entities needed additional liquidity and sought to change the borrowing percentage on accounts receivable under the StoneMor Agreement (originally capped at 35 percent).  The Line of Credit was amended several times to increase both the Credit Limit (as defined in the Line of Credit) and the percentage of StoneMor receivables relative to which Kore would make advances.  Despite this, the Moon Entities claim that the time-period between their request for funding and Kore's advances expanded, exacerbating the Moon Entities' illiquidity.[19]

---

[18]  Moon Site Management is a party to a master service agreement with StoneMor (the "StoneMor Agreement"). StoneMor is a leading owner and operator of cemeteries and funeral homes and is the largest customer of Moon Site Management.  Under the StoneMor Agreement, Moon Site Management provides total ground maintenance services to a large number of StoneMor cemeteries in Pennsylvania, Maryland, Virginia, and the District of Columbia.  The StoneMor Agreement resulted in monthly cash flow to the Moon Entities of approximately $3 million.

[19]  At oral argument, Trustee's counsel asserted that when the Moon Entities first entered the Revolving Credit Agreement, the Moon Entities generated approximately $18 million annually.  After entering into the Revolving Credit Agreement, the Moon Entities entered into new customer agreements generating approximately $65 million annually. As a result, the Moon Entities, with their expanded business base, needed more liquidity to meet the additional payroll and supply needs.  These allegations are not in the Amended Complaint, Plaintiff's counsel explained that the alleged additional facts were fleshed out during discovery.  Even considering these additional allegations, the Court's opinion in this matter is unwavering.  *See* Adv. D.I. 78 (Tr. of Hr'g (Sept. 21, 2022) at 34:19-35:5).

In or about July 2021, Kore demanded that the Moon Entities engage a financial "cash flow consultant," selected by Kore, at the Moon Entities' expense.[20]  The Moon Entities refused to hire the cash flow consultant.[21]

Around the same time, the outstanding principal balance of the Line of Credit was approximately $5 million; and the Moon Entities' accounts receivable totaled approximately $9 million.  The Moon Entities contend that, at that time, Kore was oversecured.

On or about July 10, 2021, Kore refused to fund the next draw on the Line of Credit.  Upon Kore's denial to fund, the Moon Entities anticipated failing to make payroll, which would have caused a default under the StoneMor Agreement.  To avoid a default under the StoneMor Agreement, the Moon Entities requested StoneMor pay its upcoming invoice directly to Moon Site Management instead of to Kore.

On July 16, 2021, Kore's counsel issued a Notice of Default to the Moon Entities.  In response, the Moon Entities asserted that the declaration of default was invalid and that Kore breached the Line of Credit first by refusing and/or failing to fund the next draw.  The Moon Entities maintained that Kore "consistently and repeatedly over-advanced on the Line [of Credit] despite the $3,000,000 credit limit in the Revolving Credit and Security Agreement dated May 15, 2020 [and . . .] has allowed Borrower to rely upon such over-advances and to repay the Line in the

---

[20]  The Moon Entities assert that Kore sought to impose its cash flow consultant William Arnold and his team at Marcher Consulting.  The Moon Entities represent that Mr. Arnold is a Kore shareholder.

[21]  The Moon Entities offered to hire a financial consultant previously employed by the Moon Entities as an alternative.

ordinary course and has consistently re-advanced funds to Borrower over and above the credit limit on the Line."[22]

On July 23, 2021, Kore filed a complaint in confession of judgment against the Moon Entities, as well as a receivership action seeking imposition of a receivership over the Moon Entities.

Kore also filed a separate confession of judgment action against Mr. Pursell in his individual capacity in Maryland.

In addition, Kore filed a civil suit against StoneMor first in the Court of Common Pleas of Bucks County, Pennsylvania, and then in United States District Court for the Eastern District of Pennsylvania (the "Kore-StoneMor Action"). Kore's civil suit against StoneMor alleges a cause of action for breach of contract based upon StoneMor's alleged breach of the StoneMor Agreement. Kore contends that it "stands in the shoes of [the Debtors] with respect to StoneMor's obligations to pay [pre-petition] amounts due to Moon;" and that StoneMor breached its contract with the Debtors by making three pre-petition payments to the Debtors rather than to Kore. Kore has continued to prosecute its civil suit against StoneMor after the Petition Date.

On September 15, 2021, this Court entered an Order authorizing Debtor-in-Possession Financing ("DIP Financing") on an interim basis, which permitted the Debtors to pay Kore from the proceeds of their DIP Financing one hundred percent (100%) of the principal and interest due on the Line of Credit, subject to a reservation of rights with respect to the matters complained of

---

[22] Amend. Compl. at Ex. 5, p. 1 (Letter from Kevin Silverang, counsel to Moon Entities, to David Musgrave, counsel to Kore, dated July 16, 2021).

herein, and setting forth a preliminary procedure for adjudicating Kore's contested claim for additional costs and fees.

On September 17, 2021, Debtors made an initial draw against the DIP Financing from which they paid Kore $5,455,456.13, representing one hundred percent (100%) of the principal and interest due to Kore on the Line of Credit.[23]

## **STANDARD OF REVIEW**

**A.      Motion for Judgment on the Pleadings**

Federal Rule of Civil Procedure 12(c), made applicable to this proceeding by Bankruptcy Rule 7012(b), provides that a party may raise the failure to state a claim upon which relief may be granted by a motion.  When considering a motion for judgment on the pleadings under Rule 12(c), the Court may apply the same standard as employed when considering a motion to dismiss under Rule 12(b)(6).[24]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim [for] relief that is plausible on its face.'"[25]  At this stage in the proceeding, it is not the question of "whether a plaintiff will ultimately prevail but whether the

---

[23] Kore's answer to the Amended Complaint contains a counterclaim seeking amounts owned by the Moon Entities to Kore under the Line of Credit.  As of September 27, 2021, the alleged amounts owed to Kore, exclusive of principal and interest, was approximately $727,000.  *See* Adv. D.I. 13 (*Answer to Amended Complaint and Counterclaim)* at p. 14 (asserting overadvance fees, diversion of payment fees, field examination expenses, bond charges, termination fee, Marcher Consulting Fees, wire fees, and legal fees and expenses).

[24] *In re Fedders North America, Inc.*, 422 B.R. 5 (Bankr. D. Del. 2010) (*citing In re G–I Holdings, Inc.*, 328 B.R. 691, 693–94 (D. N.J. 2005); *Children's Seashore House v. Waldman*, 197 F.3d 654, 657 n. 1 (3d Cir. 1999)).

[25] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)).

claimant is entitled to offer evidence to support the claims."[26]  The standard requires "a plaintiff to plead more than the possibility of relief to survive a motion to dismiss."[27]

It is insufficient to provide "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . ."[28]  Under this standard, a complaint "must contain either direct or indirect allegations respecting all the material elements necessary to sustain recovery under some *viable* legal theory."[29]  The Court, in order to determine whether a claim meets this requirement, must "draw on its judicial experience and common sense."[30]

In *Fowler*, the Third Circuit articulated a two-part analysis to be applied in evaluating a complaint.[31]  First, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."[32]  Second, the court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"[33]

---

[26] *Scheuer v. Rhodes*, 416 U.S. 232, 236, abrogated on other grounds by, *Harlow v. Fitzgerald*, 457 U.S. 800, 814-15 (1982); *see also Rosener v. Majestic Mgmt., Inc.* (*In re OODC, LLC*), 321 B.R. 128, 134 (Bankr. D. Del. 2005).

[27] *Id.*

[28] *Ashcroft v. Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555).

[29] *Twombly*, 550 U.S. at 562.

[30] *Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 34 (Bankr. D. Del. 2011).

[31] *Fowler*, 578 F.3d at 210-11.

[32] *Id.*

[33] *Id.* at 211.

## ANALYSIS

### A. Choice of Law

The Amended Complaint asserts causes of action under Delaware law. Kore contends, based on the parties' agreements, that Maryland law applies. The Trustee asserts there is no distinction between Delaware and Maryland law.[34]

Delaware and Maryland law, as they apply to this action, are substantially similar,[35] except as to the cause of action of the implied duty of good faith and fair dealing (Count II). Maryland law does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing, whereas Delaware does.[36] Therefore, the Court must undertake a choice of law analysis.

---

[34] *See* Adv. D.I. 78 (Tr. of Hr'g (Sept. 21, 2022) at 57:13-58:2) (Trustee's counsel: "we did not take a strong position on that because I frankly did not see a major conflict between Delaware or Maryland law or, frankly, the laws of any of our United States . . . ").

[35] "As this case was commenced in Delaware, the Court will apply Delaware's choice of law rules." *Pennsylvania Emp., Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp.2d 458, 466 (D. Del. 2010). The Delaware District Court held:

> When ascertaining what law should be applied, Delaware employs a two-pronged approach, where the court must: (1) compare laws of the competing jurisdictions to determine whether laws actually conflict on a relevant point, and then, if actual conflict exists; (2) apply the "most significant relationship" test. However, before a choice of law question arises, there must actually be a conflict between the potentially applicable bodies of law where there is no such conflict the court should avoid the choice of law question. That is, where there is no conflict of laws, the court can apply the laws of the relevant states interchangeably in discussing the law applicable to the case.

*Hardwire, LLC v. Zero Int'l, Inc.*, No. CV 14-54-LPS-CJB, 2014 WL 5144610, at *7 (D. Del. Oct. 14, 2014) (citations, text modifications, and quotations marks omitted).

[36] *Compare Cutler v. Wal-Mart Stores, Inc.*, 175 Md. App. 177, 195, 927 A.2d 1, 11 (2007) ("Maryland law does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing." (citations omitted)) *with Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572, 581–82 (D. Del. 2007) ("In order to plead successfully a breach of an implied covenant of good faith and fair dealing, the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." (citation and internal quotation marks omitted)).

The Revolving Credit Agreement states:

10.3 <u>GOVERNING LAW, SUBMISSION TO JURISDICTION, VENUE</u>

(a) BORROWER IRREVOCABLY CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE STATE OF MARYLAND AND THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND AND WAIVES ANY OBJECTION BASED ON VENUE OR FORUM NON CONVENIENS WITH RESPECT TO ANY ACTION INSTITUTED THEREIN ARISING UNDER THIS AGREEMENT OR IN ANY WAY CONNECTED OR RELATED OR INCIDENTAL TO THE DEALINGS OF BORROWER AND LENDER IN RESPECT OF THIS AGREEMENT OR THE TRANSACTIONS RELATED HERETO. . . . [37]

Although, the Revolving Credit Agreement does not contain a "choice of law" or "governing law" provision, the parties consented to jurisdiction and venue in the Maryland courts.  The loan modification and forbearance agreements, that were subsequently executed by the parties, contain choice of law provisions, indicating Maryland law governs all disputes arising therefrom.[38]  The choice of law provisions in the subsequently executed loan modification and forbearance agreements effectively supplant the absence of a choice of law provision in the Revolving Credit Agreement.  Any dispute under the Revolving Credit Agreement could also be thought of as arising under the loan modification and forbearance agreements because such dispute would inherently concern the Debtors' ability to perform under the Line of Credit.[39]

---

[37] Amend. Compl. at Ex. 1 (Revolving Credit and Security Agreement, dated May 15, 2020) at § 10.3(a).

[38] *See* Adv. D.I. 26 (Defendant Kore Capital Corporation's Memorandum of Law in Support of Motion for Judgment on the Pleadings), Ex. 1 (Loan Modification Agreement, dated Sept. 16, 2020 at § 12 (Maryland); Second Loan Modification Agreement, dated May 24, 2021 at § 12 (Maryland); Forbearance/Loan Modification Agreement, dated December 20, 2020 at § 15 (Maryland); and Waiver/Loan Modification Agreement, dated June 28, 2021 at § 13 (Maryland)).

[39] *Niagara Frontier Transit Metro Sys., Inc. v. Cnty. of Erie*, 212 A.D.2d 1027 (1995) ("Where the contract is unambiguous on its face, it should be construed as a matter of law and summary judgment is appropriate."); *Green*

In addition, both the Moon Entities and Kore maintain their principal offices in Maryland,[40] the Revolving Credit Agreement was executed in Maryland,[41] and the alleged conduct occurred in Maryland.[42]  For these reasons, Maryland law applies to the Revolving Credit Agreement as well as the other documents that make-up the Line of Credit.

## B.  The Line of Credit Refutes Counts I-VI and Count VIII

Kore argues that the claims set forth in the Amended Complaint are "legally and factually deficient" and fail to state a claim upon which relief can be granted.  Specifically, Kore asserts that the Amended Complaint fails to specify any provisions in the Line of Credit that Kore breached and that the terms of the Line of Credit do not support the Trustee's claims.  Kore contends that it exercised permissible remedies under the Line of Credit.

The Trustee alleges that Kore breached the Line of Credit after Kore demanded the Moon Entities retain a consultant and then refused to fund the advances on the Line of Credit.  The Trustee refutes Kore's claim of unfettered discretion regarding whether to make advances under the Line of Credit.  The Trustee does not refute Kore's plain reading of the provisions of the Line of Credit.  Rather, the Trustee argues an implied duty of good faith and fair dealing exists, which curtailed Kore's discretion with respect to advances.

---

*Mach. Corp. v. Zurich Am. Ins. Grp.*, No. CIV. A. 99-3048, 2001 WL 1003217, at *6 (E.D. Pa. Aug. 24, 2001) ("Whether a contract provision is ambiguous is a question of law for the court."), *aff'd sub nom. Green Mach. Corp. v. Zurich-Am. Ins. Grp.*, 313 F.3d 837 (3d Cir. 2002).

[40]  *See* Adv. D.I. 26 (Defendant Kore Capital Corporation's Memorandum of Law in Support of Motion for Judgment on the Pleadings) at n. 3.

[41]  *See* Adv. D.I. 26 (Defendant Kore Capital Corporation's Memorandum of Law in Support of Motion for Judgment on the Pleadings) at n. 3.

[42]  *See* Adv. D.I. 26 (Defendant Kore Capital Corporation's Memorandum of Law in Support of Motion for Judgment on the Pleadings) at n. 3.

The Court begins its examination with section 2.1 of the Revolving Credit Agreement which states, in part:

> 2.1     Credit Facility.  At Borrower's request during the Term of this Agreement, Lender *in its sole discretion* may make Advances to Borrower, subject to receipt of such financial information as Lender shall require and as otherwise provided in this Agreement.[43]

Section 2.3 of the Revolving Credit Agreement provides, in part:

> 2.3     Adjustments. Lender shall determine the amount that may be made available to Borrower under the [Revolving] Credit Facility based on the most recent Accounts Reporting Certificate delivered to Lender in accordance with this [Revolving Credit] Agreement and such other information as may be available to Lender.[44]

The Trustee relies on the Sixth Circuit's holding in *K.M.C. Co., Inc. v. Irving Trust Company* in support of its argument.[45]  K.M.C. was a wholesale and retail grocer with a revolving line of credit from Irving Trust Co.  Irving Trust Co. had a security interest in K.M.C.'s accounts receivable and inventory and a lockbox arrangement with K.M.C.  Irving Trust Co. refused to fund an advance that would approach K.M.C.'s credit limit.  K.M.C. argued that Irving Trust Co.'s refusal without prior notice to advance the requested funds breached a duty of good faith performance implied in

---

[43] Amend. Compl., Ex. 1 (Revolving Credit and Security Agreement) at § 2.1 (emphasis added).

[44] Amend. Compl., Ex. 1 (Revolving Credit and Security Agreement) at § 2.3.  The Revolving Credit Agreement contained the following termination provision:

> [I]f the Lender exercises **its discretion** to cease making Advances under this Agreement and no Event of Default has occurred and is continuing, Borrower may terminate this Agreement by delivering 10 days written notice to Lender and, in such event, Borrower shall not be liable to Lender for any Termination Fee.

Amend. Compl., Ex. 1 (Revolving Credit Agreement) at § 10.12 (emphasis added).  This would allow the Moon Entities, without payment of a Termination Fee, to terminate the agreement in the event that Kore did not fund Advances, that were in Kore's discretion to make.

[45] *K.M.C. Co. v. Irving Tr. Co.*, 757 F.2d 752 (6th Cir. 1985).

the agreement and ultimately resulted in the collapse of the company as a viable business entity.[46]

The Sixth Circuit held that:

> [T]he literal interpretation of the financing agreement urged upon us
> by Irving, as supplemented by the "blocked account" mechanism,
> would leave K.M.C.'s continued existence entirely at the whim or
> mercy of Irving, absent an obligation of good faith performance.
> Logically, at such time as Irving might wish to curtail financing
> K.M.C., as was its right under the agreement, this obligation to act
> in good faith would require a period of notice to K.M.C. to allow it
> a reasonable opportunity to seek alternate financing, absent valid
> business reasons precluding Irving from doing so.[47]

The Trustee argues, based on the holding of *K.M.C.*, that a lockbox arrangement is the key

distinction triggering Kore's fiduciary duties to the Moon Entities. The Trustee asserts that the

Moon Entities were in the position of asking Kore for *their own* money as all of their accounts

receivable were paid into the lockbox operated by Kore and then Kore would loan the Moon

Entities based on the formula in the Revolving Credit Agreement.[48] This argument is misplaced.

First, the accounts receivable were not the Moon Entities' "money" – it was Kore's cash

collateral. Kore had a first-priority lien on the accounts receivable.[49] And the parties contracted

---

[46] *Id.* at 754.

[47] *Id.* at 759 (citations omitted); *Wells v. Alexandre*, 130 N.Y. 642, 645, 29 N.E. 142, 143 (1891) (citations omitted) ("[I]f a notice was requisite to its proper execution, a covenant to give such notice will be inferred, for any other construction would make the contract unreasonable, and place one of the parties entirely at the mercy of the other."). *Howard Oaks, Inc. v. Maryland Nat. Bank*, 810 F. Supp. 674, 677 (D. Md. 1993) ("[T]his Court holds that, under the U.C.C. as well as the general law of Maryland, there is no independent duty of good faith in commercial dealing enforceable by an action *ex delicto.*"). *See also Marland v. Safeway, Inc.*, 65 F. App'x 442, 449 (4th Cir. 2003) ("Maryland law recognizes an implied duty of good faith and fair dealing in sales contracts.").

[48] Adv. D.I. 78 (Tr. of Hr'g (Sept. 21, 2022) at 27:3-6) (Trustee's counsel: "[E]very dollar that came into Moon actually went into Kore and then Moon had to then ask Kore to give it back its own money, right? That was the arrangement."). *See also id.* at 28:2-3.

[49] Adv. D. I. 78 (Tr. of Hr'g (Sept. 21, 2022) at 36:17-22 (During argument, Trustee's counsel admitted at argument that Kore had a lien in the Moon Entities' accounts receivable: "They had a lien and it went a step beyond that. All of the receivables, as they got paid, had to be deposited in an account that Kore controlled. And in fact, beyond that

for the Line of Credit, borrowing base, lockbox arrangement, and first priority liens in the Moon

Entities' accounts receivable.

Second, Maryland law holds that the relationship of a bank to its customer in a loan

transaction is ordinarily a "contractual relationship between a debtor and a creditor, and is not

fiduciary in nature."[50] Generally, there are no fiduciary duties owed between contracting parties.[51]

In order to create fiduciary duties between contracting parties, the Trustee would have to allege

that the Moon Entities relied heavily on Kore's judgment in operating and maintaining their

businesses. Here, other than the lockbox arrangement, there is no allegation (or plausibility) of

the Moon Entities relying "heavily" on the judgment of Kore.

---

which is, you know, it's certainly an arrangement that exists in commercial lending and receivables lending, but it gives Kore complete control, right?")).

[50] *Yousef v. Trustbank Sav., F.S.B.*, 568 A.2d 1134, 1138 (Md. Ct. Spec. App. 1990).

[51] The District Court in the Southern District of New York held:

> As a more general matter, the normal trust between contracting parties does not operate to turn a formal, contractual relationship into a fiduciary relationship unless one of the parties places great trust in and relies heavily on the judgment of the other party.

*In re Lois/USA, Inc.*, 264 B.R. 69, 130–31 (Bankr. S.D.N.Y. 2001) (citations, quotation marks, and modifications omitted). *See also Tchrs. Ins. & Annuity Ass'n of Am. v. LaSalle Nat. Bank*, 295 Ill. App. 3d 61, 71, 691 N.E.2d 881, 889 (1998) (holding that the asserting party has "not pointed to anything in the written credit agreement that would support a finding that defendants placed great trust in and relied on plaintiff as to any of the terms in the written credit agreement."). *See also Delta Mills, Inc. v. GMAC Commercial Finance LLC (In re Delta Mills, Inc.)*, 404 B.R. 95, 114 (Bankr. D. Del. 2009) ("[T]he relationship between Delta and GMAC was a debtor-creditor relationship. Their relationship was based upon the extension of credit by GMAC through the purchase of Delta's accounts receivable."); *OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, 340 B.R. 510, 518–19 (Bankr. D. Del. 2006) (holding that "the general rule that fiduciary obligations do not exist between commercial parties operating at arms' length—even sophisticated counseled parties"); *Asurion Ins. Services, Inc. v. Amp'd Mobile, Inc. (In re Amp'd Mobile, Inc.)*, 377 B.R. 478, 483 (Bankr. D. Del. 2007) (holding that "unrelated commercial entities are presumed by the Court to be in a debtor-creditor relationship, rather than a fiduciary relationship, absent evidence that the parties intended a more substantial relationship.").

Finally, in *Marland v. Safeway Inc.*, the Fourth Circuit abrogated the holding in *K.M.C.*[52]

Kore is correct that the implied duty of good faith and fair dealing is not an unfettered obligation, nor an independent cause of action under Maryland law, and Maryland courts have recognized that this duty does not obligate a party to take affirmative actions that are not required under the contract.

> Under Maryland law, a duty of good faith and fair dealing is an implied term in certain contracts, but this duty simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract. Thus, the duty of good faith merely obligates a lender to exercise good faith in performing its contractual obligations; **it does not obligate a lender to take affirmative actions that the lender is clearly not required to take under its loan documents**.[53]

The Revolving Credit Agreement provides that Kore shall have "sole discretion" in making advances and Kore had broad authority whether to fund advances to the Moon Entities, this does not create a fiduciary relationship. Moreover, Kore's refusal to give the Moon Entities additional

---

[52] *Quality Auto Co. v. Signet Bank/Maryland*, 775 F. Supp. 849, 853 (D. Md. 1991); *abrogated by Marland v. Safeway, Inc.*, 65 Fed. Appx. at 449 (recognizing abrogation of *Quality Auto Co.* holding); *Mount Vernon Properties, LLC v. Branch Banking and Trust Co.*, 907 A.2d 373, 381 (Md. App. 2006) ("no independent cause of action at law exists in Maryland for breach of the implied duty of good faith and fair dealing). The Trustee submitted supplemental briefing in support of its position that the implied duty of good faith and fair dealing is an independent cause of action in Maryland. *See* Adv. D.I. 49 (*citing Bailey Tool & Mfg. Co. v. Republic Business Credit, LLC (In re Bailey Tool & Mfg. Co.)*, No. 16-30503-SGJ-7, 2021 WL 6101847 (Bankr. N.D. Tex. Dec. 23, 2021) (Louisiana law). Not only is *In re Bailey Tool & Mfg. Co.* interpreting Louisiana law, *id.* at *40, but the *Bailey Tool* Court found that the lender, under a factoring agreement, was a result of grossly overreaching conduct that was not authorized under the contract. *Id.* at *41. The Court finds that *In re Bailey Tool & Mfg. Co.* is not persuasive precedent in the facts and circumstances of the matter before the Court (i.e. interpreting Louisiana law, interpreting a factoring agreement, and factual differences).

[53] *Parker v. Columbia Bank*, 604 A.2d 521, 531 (Md. Ct. Spec. App. 1992) (citations omitted; emphasis added). *Donnelly v. Branch Banking & Tr. Co.*, 971 F. Supp. 2d 495, 508–09 (D. Md. 2013) ("Maryland law does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing. A breach of the implied covenant simply supports a cause of action for breach of contract. The implied duty of good faith prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." (citations and internal quotations marks omitted)); *Polek v. J.P. Morgan Chase Bank, N.A.*, 36 A.3d 399, 416 (Md. 2012) ("Absent special circumstances . . . no new obligations on the parties are imposed, where the contract is silent, by the implied covenant of good faith and fair dealing." (citations omitted)).

17

advances did not prevent the Moon Entities from performing under the Revolving Credit Agreement.[54]  The Court cannot read a new substantive obligation into the Revolving Credit Agreement that is simply not there.[55]

The asserted extra-contractual obligations are the predicate for a majority of the counts in the Amended Complaint, and as a result, the Trustee has failed to state any cause of action by which the Court can grant related relief for Counts I-VI and Count VIII.  Still, the Court will discuss and evaluate each of these counts for completeness.

## C.    The Causes of Action

### i.    *Breach of Contract*

The Trustee alleges two breach of contract claims in the Amended Complaint: (a) Count I: Kore breached the Line of Credit by refusing to fund advances; and (b) Count VIII: Kore breached the Line of Credit by assessing excessive overadvance fees.

#### a.  Count I: Funding of Advances

The Trustee asserts that: (i) the Revolving Credit Agreement was modified by the parties' course of dealings, including oral agreement; (ii) section 2.3 of the Revolving Credit Agreement authorized and contemplated Kore making such increases to the borrowing base; (iii) the Moon

---

[54]  *Am. Bank v. Bay Bank, F.S.B.*, No. 1531 Sept.term 2014, 2015 WL 6105507, at *7 (Md. Ct. Spec. App. July 14, 2015) (holding that the [implied duty of good faith and fair dealing] "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." (citations omitted)).

[55]  *Am. Dredging Co. v. Plaza Petroleum, Inc.*, 799 F. Supp. 1335, 1339 (E.D.N.Y. 1992), vacated in part, 845 F. Supp. 91 (E.D.N.Y. 1993) ("When the contract is between two commercial entities, unconscionability must be viewed in light of the general commercial background and the commercial needs of the particular trade or case, and there is a presumption of conscionability when the contract is between businessmen in a commercial setting." (citations and internal quotation marks omitted)).

Entities complied with all financial disclosures to Kore; (iv) Kore could have required additional financial information in order to make further advances; (v) Kore was substantially oversecured; (vi) Kore did not provide sufficient notice of its refusal to make additional advances; and (vii) such unreasonable refusal harmed the Moon Entities' business.  The Trustee continues that Kore attempted to force the Moon Entities to hire a cash flow consultant, and when the Moon Entities refused, Kore retaliated by refusing to make advances under the Revolving Credit Agreement.

As discussed above, under the terms of the Revolving Credit Agreement, Kore retained the sole discretion over whether to make advances to the Moon Entities.  At argument, the Trustee asserted, for the first time, that between the time the Moon Entities entered the Line of Credit and when Kore stopped advancing funds, the Moon Entities' business expanded from $18 million to $65 million annually, resulting in higher cash needs.  The Trustee maintains that Kore should have increased the Line of Credit and funded the Moon Entities.[56]

---

[56]  Adv. D.I. 78 (Tr. of Hr'g (Sept. 21, 2022) at 35:6-24):

> [Trustee's counsel]: An $18 million-a-year business when the negotiations start. The contract is signed just before the loan agreement is signed, but it wasn't really in effect. It didn't come into effect until several months later and that's when you see the line goes from three to four to, ultimately, nearly five and a half million dollars for the bulk of it; however, when you from 18 to 65, your expenses increase in proportion. And so the line really should have increased three and a half times to, let's say –
>
> THE COURT: But the parties never contracted for that.
>
> [Trustee's counsel]: They didn't do that, admittedly, but they did -- as we allege and as the course of conduct confirms, they did at least agree to increase it to five and a half million dollars approximately because that's what Kore advanced for the better part of a year. And, frankly, that wasn't sufficient and Kore knew it because Kore received our accounts payable reports and they knew that our cash flow needs were greater than that . . .

*See also id.* at 42:17-19 (Trustee's counsel: "$18 million business when the contract starts, $65 million contract when . . . business when we reach the end").

The Trustee's assertions are not plausible. There is nothing in the Line of Credit that requires Kore to increase availability (or requires overadvances). The Trustee asks the Court to read into the Line of Credit both that (i) the advances were mandatory and (ii) Kore was required to provide notice of its intent to decline to advance funds. There is no support for the existence of either of these terms in the Revolving Credit Agreement.

To the contrary, the Revolving Credit Agreement specifically provides for the following:

> 2.1: . . .Lender in its sole discretion may make Advances to Borrower . . . .
>
> 2.3: Lender shall determine the amount that may be made available to Borrower under the [Revolving] Credit Facility . . .
>
> 4.5: Borrower hereby irrevocably authorizes and appoints Lender, or any Person as Lender may designate, as Borrower's attorney-in-fact, at Borrower's cost and expense, to exercise all of the following powers . . . (f) to do all other acts and things as Lender may deem reasonable to protect or preserve Lender's interest under this Agreement or to fulfill Borrower's obligations under this Agreement.

Under the terms of the Line of Credit, the parties course of dealings did not modify that agreement.

The Revolving Credit Agreement states:

> No amendments, riders, supplements, or waiver of any provision of this [Revolving Credit] Agreement, or consent to any departure by Borrower therefore shall in any event be effective unless the same shall be *in writing* and *signed* by (i) Borrower and Lender or (ii) Lender (with respect to a waiver or consent by it) or Borrower (with respect to a waiver or consent by it), as the case may be, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.[57]

---

[57] Amend. Compl., Ex. 1 (Revolving Credit Agreement) at § 10.8(b) (emphasis added).

Pursuant to this term, the parties modified the terms of the Revolving Credit Agreement through four written agreements.[58]

In each of the modification agreements to the Revolving Credit Agreement, the Moon Entities: (i) ratified and confirmed that the Loan Documents continued to be in full force and effect except as otherwise modified in that particular agreement, (ii) agreed that the Loan Documents were fully enforceable against the Moon Entities, and (iii) agreed that no amendments or waivers were effective unless set forth in a signed writing.[59]  None of these modification agreements support the Trustee's arguments that "past advances amount to a waiver of [Kore's] discretionary ability to refuse to consent [to advances] in the future."[60]

As to the Trustee's allegations of retaliation for the refusal to hire the cash flow consultant, there is nothing in the Line of Credit requiring the Moon Entities to hire a cash flow consultant. Additionally, there is nothing in the Revolving Credit Agreement requiring Kore to make advances to the Moon Entities.  Furthermore, there are no facts in the Amended Complaint to indicate that Kore's actions were retaliatory.  Kore's refusal to make advances was not outside the corners of

---

[58] *See* Adv. D.I. 26 (Defendant Kore Capital Corporation's Memorandum of Law in Support of Motion for Judgment on the Pleadings), Ex. 1 (Loan Modification Agreement, dated Sept. 16, 2020; Second Loan Modification Agreement, dated May 24, 2021; Forbearance/Loan Modification Agreement, dated December 20, 2020; and Waiver/Loan Modification Agreement, dated June 28, 2021).

[59] *See* Adv. D.I. 26 (Defendant Kore Capital Corporation's Memorandum of Law in Support of Motion for Judgment on the Pleadings), Ex. 1 (Loan Modification Agreement dated September 16, 2020, §§ 6, 8(iv), 10; Forbearance/Loan Modification Agreement dated December 30, 2020, §§ 9, 11(vi), 13; Second Loan Modification Agreement dated May 24, 2021, §§ 6, 8(vi), 10; and Waiver/Loan Modification Agreement dated June 28, 2021, §§ 7, 9(v), 11).

[60] *Wireless Properties, LLC v. CC Fin. LLC*, 10 A.3d 613, 618 (Del. 2010). *See also Riggs Nat. Bank of Washington, D.C. v. Linch*, 36 F.3d 370, 373 (4th Cir. 1994) ("An implied duty of good faith cannot be used to override or modify explicit contractual terms."); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990) ("Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.'").

the contract. Simply stated, Kore exercised its discretion under the Line of Credit and denied advances.

The Trustee's claim for breach of contract in Count I is not plausible and the Court will grant the Motion as to Count I of the Amended Complaint.

### b. Count VIII: Overadvance Fees

In Count VIII of the Amended Complaint, the Trustee alleges that Kore assessed overadvance fees under the Line of Credit that were unjustified and excessive and improperly inflated the loan balance and the calculation of principal and interest paid to Kore by the Moon Entities.[61]

Kore points out that in each loan modification, the Moon Entities agreed that all interest, fees, and other charges imposed and collected by Kore were valid, correct and proper, and complied with all aspects of the Line of Credit.[62] In addition, the Moon Entities acknowledge in the Waiver/Loan Modification Agreement, dated June 28, 2021, that they violated the credit limit and overadvance provisions of section 2.9 of the Loan and Security Agreement.[63]

---

[61] The Trustee attaches an "example" of fees charged in the amount of $17,500 between January 21, 2021, and February 20, 2021. The Trustee alleges these charges were improper because Kore never demanded repayment pursuant to the terms of the Line of Credit. Amend. Compl. at ¶¶ 147-150 and Ex. 9 (showing 18 entries in the "Over Advance Manual" column totaling $17,500).

[62] Adv. D.I. 26 (Defendant Kore Capital Corporation's Memorandum of Law in Support of Motion for Judgment on the Pleadings), Ex. 1 (Loan Modification Agreement dated September 16, 2020, § 8(i); Forbearance/Loan Modification Agreement dated December 30, 2020, § 11(i); Second Loan Modification Agreement dated May 24, 2021, § 8(i); and Waiver/Loan Modification Agreement dated June 28, 2021, § 9(i)).

[63] *See* Adv. D.I. 26 (Defendant Kore Capital Corporation's Memorandum of Law in Support of Motion for Judgment on the Pleadings), Ex. 1 (Waiver/Loan Modification Agreement dated June 28, 2021, §3 (Cure of Overadvance. As a result of the Borrower's false reporting of accounts receivable, the Borrow is not in compliance with Section 2.9 of the Loan [and Security] Agreement. If Borrower has not cured the failure to comply with Section 2.9 of the Loan [and Security] Agreement by July 2, 2021, Borrower shall pay $10000.00 to the Lender. If Borrower has not cured the failure to comply with Section 2.9 of the Loan Agreement by July 9, 2021, Borrower shall pay $20,000.00 to the Lender.)).

The Trustee contends that this causes of action accrued in July of 2021, weeks after the releases discussed above were signed.  The Trustee makes no further argument or factual references in support of Count VIII.

The Amended Complaint claims overadvances from January 21, 2021 through February 20, 2021, which *pre-date* the release in the Waiver/Loan Modification Agreement, dated June 28, 2021.  The Moon Entities released their overadvance claims in the Waiver/Loan Modification Agreement, dated June 28, 2021, and have made no factual assertions regarding the breach of contract claim related to overadvances after June 28, 2021.

As a result, Trustee's claims in Count VIII are not plausible and the Court will grant the Motion as to Count VIII of the Amended Complaint.

### ii.    *Breach of Implied Duty of Good Faith and Fair Dealing*

Count II of the Amended Complaint claims that Kore breached the implied duty of good faith and fair dealing because Kore refused to fund loan advances, interfered with the Moon Entities' mail delivery,[64] sued StoneMor, and threatened to contact the Moon Entities' customers and other lenders.[65]

---

[64]  *See also* Am Compl, Ex. 1 (Revolving Credit Agreement at § 4.5 ("Borrower hereby irrevocable authorizing and appoints Lender, or any Person as Lender may designate, as Borrower's attorney-in-fact, at Borrower's costs and expense, to exercise all of the following powers either before or upon the occurrence of an Event of Default, which being coupled with an interest, shall be irrevocable until all of the Obligations to Lender have been paid and satisfied in full: . . . (b) to receive, open and dispose of all mail addressed to Borrower in connection with any lockbox or Deposit Account under Lender's Control and *upon the occurrence of an Event of Default to notify postal authorities to change the address for delivery thereof to such address as Lender may designate; . . . .*" (emphasis added))).  Again, the Line of Credit provides Kore with broad authority to take various actions, including changing the mailing address. The factual plausibility of this allegation is unfounded.

[65]  *See also* Amend. Compl., Ex. 1 (Revolving Credit Agreement at § 4.5 ("Borrower hereby irrevocable authorizing and appoints Lender, or any Person as Lender may designate, as Borrower's attorney-in-fact, at Borrower's costs and expense, to exercise all of the following powers either before or upon the occurrence of an Event of Default, which being coupled with an interest, shall be irrevocable until all of the Obligations to Lender have been paid and satisfied

As discussed above, Maryland law recognizes that every contract imposes a duty of good faith and fair dealing in its performance.[66] This duty "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract."[67] Maryland law does not, however, recognize an independent cause of action for the breach of the implied duty of good faith and fair dealing in a contract. As such, the Court will grant the Motion as to Count II of the Amended Complaint.

### iii.    Tortious Interference with Contract

In Count III of the Amended Complaint, the Trustee asserts that Kore's insistence that StoneMor continue to remit payments into Kore's lockbox constituted tortious interference.

A claim for intentional interferences with contractual or business relations requires:

> (1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.[68]

Kore argues that, under the Line of Credit, it was authorized to notify the Moon Entities' account debtors, such as StoneMor, of Kore's interest in the Moon Entities accounts receivable, direct those

---

in full: . . . (d) to give Obligors notice of Lender's interest therein, and/or instruct such Obligors to may payment directly to Lender for Borrower's account; (e) to take or bring, in the name of Lender or Borrower, all steps, actions, suits or proceedings deemed by Lender necessary or desirable to enforce or effect collection of the Accounts; . . ."). Again, the Line of Credit provides Kore with broad authority to take various actions, including contacting each of the Moon Entities' customers. As a result, there is no factual plausibility for this allegation of wrongdoing.

[66] *Abt Assocs., Inc. v. JHPIEGO Corp.*, 104 F. Supp. 2d 523, 534 (D. Md. 2000), *aff'd*, 9 F. App'x 172 (4th Cir. 2001) (*citing Food Fair Stores, Inc. v. Blumberg*, 200 A.2d 166 (Md. 1964)).

[67] *Parker*, 604 A.2d at 531.

[68] *Kaser v. Fin. Prot. Mktg., Inc.*, 831 A.2d 49, 53 (Md. 2003) (citations and quotation marks omitted). *See also Blondell v. Littlepage*, 991 A.2d 80, 97 (Md. 2010).

account debtors to make payments directly to Kore, and pursue collection against those account debtors if they failed to pay Kore as directed.[69]

The Trustee contends the Moon Entities were relieved of their obligations under the Line of Credit, including their pledge of receivables to Kore, upon Kore's refusal to make further advances, which was a material breach of the agreement. The Moon Entities further allege that the Kore-StoneMor Action is meritless and caused further harm to the Moon Entities relationship with StoneMor, especially considering that Kore has been repaid in full.

With this backdrop, the Court must consider whether Kore materially breached the Line of Credit, absolving the Moon Entities' diversion of funds.[70] The Court finds that sections 4.5 and 4.6 of the Line of Credit authorizes Kore to (i) receive payments made by StoneMor and

---

[69] Amend. Compl., Ex. 1 (Revolving Credit Agreement § 4.5 ("Borrower hereby irrevocably authorizes and appointed Lender . . . as Borrower's attorney-in-fact, at Borrower's cost and expense, to exercise all of the following powers either before or upon the occurrence of an Event of Default . . . . (a) to receive, take, endorse, sign, assign and deliver, all in the name of Lender or Borrower, as the case may be, any and all checks, notes, drafts and other documents or instruments relating to the Collateral and to apply such amount to the Obligations in accordance with this Agreement . . . "); § 4.6 ("Lender will notify all Obligors of all Accounts that the Borrower has granted a security interest in the Accounts to Lender and that payments ad remittances are to be made directly to Lender or as otherwise directed by Lender."); and § 9.1 ("In addition to all other rights and remedies available to Lender under the UCC or other applicable law, and contained in this Agreement or any other Credit Document, Lender may exercise the following rights and remedies upon the occurrence of an Event of Default: (a) Re-notice all Obligors to make all payments directly to Lender . . . ")).

[70] *Glen Alden Corp. v. Duvall*, 215 A.2d 155, 172 (Md. 1965) (*quoting* 5A Corbin Contracts, § 1237, pp. 545-554): ("'When the injured party asserts his own freedom from the duty to perform further, he is merely trying to avoid further loss from the other's wrong—something that the law often requires of him whether he is willing or not. There are other methods by which he may reasonably endeavor to avoid or reduce injury; he may contract for some substitute material or service; he may ask the repudiator to repent and retract; he may demand replacement or the repair of defects; he may ask compensation for what he has done; he may demand his mon[e]y back or reconveyance of the property; and he may demand compensatory damages. In doing these things, he is trying to avoid harms and losses; he is not offering a 'rescission' or 'waiving' his rights or 'electing' a remedy. There also are things that the injured party can do; but they are clearly distinguishable.'" (emphasis removed)).

(ii) enforce payment under the StoneMor Agreement on behalf of the Moon Entities.[71]

Specifically, section 4.5 of the Revolving Credit Agreement provides, in part:

> Borrower hereby irrevocably authorizes and appoints Lender, or any Person as Lender may designate, as Borrower's attorney-in-fact, at Borrower's cost and expense, to exercise all of the following powers …
>
> (b) to receive, open and dispose of all mail addressed to Borrower in connection with any lockbox or Deposit Account under Lender's Control and upon the occurrence of an Event of Default to notify postal authorities to change the address for delivery hereof to such address as Lender may designate; ….
>
> …
>
> (e) to take or bring, in the name of Lender or Borrower, all steps, actions, suits or proceedings deemed by Lender necessary or desirable to enforce or effect collection of the Accounts;
>
> (f) to do all other acts and things as Lender may deem reasonable to protect or preserve Lender's interest under this Agreement or fulfill Borrower's obligations under the Agreement.

The Line of Credit provides for these remedies regardless of whether the Moon Entities were in default under the Line of Credit. Thus, Kore did not commit a material breach of the Line of Credit, rather it exercised its contractual rights.[72]  As a result, the factual allegations are not

---

[71]  The parties do not dispute the text of the agreements governing the Line of Credit, rather the legal effect on the parties' obligations. Having concluded that the Complaint alleges no facts that would permit the Court to conclude that extrinsic facts modify the terms of the agreement, all that remains is for the Court to interpret the written terms of the contract, which is a question of law. Thus, the Court may properly dispose of this count by interpreting the terms of the Line of Credit. *Della Ratta, Inc. v. Am. Better Cmty. Devs., Inc.*, 380 A.2d 627, 633–34 (Md. 1977) ("To become a question of law, the record must clearly show that there is no room for evidentiary interpretation by a fact-finder in light of existing law on the subject at hand. Stated differently, where the language of a contract, considered in the light of its subject matter, and its object or purpose, is clear and unambiguous, the construction of the contract is a matter of law for the court. The court, as a matter of law, will then interpret that language according to what a reasonable person in the position of the parties would have thought it meant." (citations and quotations marks omitted)).

[72]  *Reading Co-Op. Bank v. Suffolk Constr. Co.*, 984 N.E.2d 776, 782 (Mass. 2013) ("Once an account debtor (here, Suffolk) receives notification of an assignment, it may discharge its contractual obligation to the assignor (here, the subcontractor) only by paying the assignee (here, the bank).  Therefore, upon receipt of notification of assignment,

plausible, and Kore cannot be held liable for tortious interference of the Line of Credit.  Under the

facts alleged, the Court will grant the Motion as to Count III of the Amended Complaint.

### iv.    *Common Law Fraud and Fraudulent Misrepresentation*

The Trustee asserts two fraud-based causes of action in Counts IV and V.  The Trustee

claims that Kore encouraged and accommodated overadvances under the Line of Credit.  Further,

he asserts that the limitations on the Moon Entities' draws against the StoneMor accounts

receivable were unreasonable because (a) Kore was oversecured, (b) StoneMor was a reliable

payor making regular payments per the StoneMor Agreement, and (c) the low limits on the Line

of Credit left the Moon Entities unable to meet the cash flow needs of their business operations.

Kore argues that these two fraud-based claims are tort claims that cannot arise from a

breach of contract under Maryland law.  Kore further contends that the economic loss doctrine

prohibits the Trustee from recovering tort damages for what was in fact a breach of contract claim.

The Trustee responds that although Kore and the Moon Entities were in privity, the lockbox

relationship created an "intimate nexus," which allows an independent tort claim to survive.  The

Trustee contends that Kore made a series of fraudulent and/or negligent misrepresentations

designed to induce the Moon Entities' reliance.  In other words, the Trustee alleges "malice" on

behalf of Kore which would allow a tort to arise out of the contractual relationship.  The Trustee

---

the account debtor becomes statutorily obligated to pay the assignee in order to discharge its contractual obligation to the assignor.  Upon the assignor's default, the assignee 'may notify an account debtor ... to make payment or otherwise render performance to or for the benefit of the secured party' and 'may enforce the obligations of an account debtor ... and exercise the rights of the [assignor] with respect to the obligation of the account debtor.'  Thus, where an account debtor receives notification of assignment but nonetheless pays only the assignor, the account debtor remains obligated in full under the contract, and upon the assignor's default, the assignee may enforce the account debtor's contractual obligations." (citations omitted)).

asks the Court to find "malice" because the Moon Entities believed that Kore would always fund advances and overadvances under the Line of Credit.

Under Maryland law, a "fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract."[73]  However an exception to the privity rule is "the intimate nexus test [which] requires the relationship between the parties to be sufficiently close— or intimate—to support finding a tort duty.  In these cases, if an intimate nexus was established, a duty of care was owed, and the defendant could be held liable to the plaintiff for pecuniary losses."[74]

Before the Court are sophisticated commercial parties, represented by counsel, who negotiated and entered a Line of Credit.  The parties' entire relationship is encompassed in the Line of Credit.  This contractual association is not akin to an "intimate relationship" where some parties are relying on others with whom they are not in privity.[75]  Maryland law counsels that an

---

[73] *Douglas v. GSJT, Inc. (In re Douglas)*, 623 B.R. 715, 728 (Bankr. D. Md. 2020) (citations and quotation marks omitted), *cert. denied sub nom. Douglas v. Dry Clean Concepts, Inc.*, No. GJH-20-3184, 2021 WL 4951918 (D. Md. Oct. 25, 2021).

[74] *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 155 A.3d 445, 453 (Md. 2017) (citations omitted).  ("We have emphasized that 'in those occupations requiring peculiar skill, a tort duty to act with reasonable care will be imposed on those who hold themselves out as possessing the requisite skill," regardless of whether the parties are in contractual privity.  These occupations include 'professionals such as physicians, attorneys, architects, and public accountants.'  Instead, we find persuasive the logic of states barring negligence claims for purely economic damages against design professionals in complex construction projects absent privity.  But our view turns on the unique aspects of large-scale public construction, rather than the finer distinctions of tort law." *Id.* at 459 (citations omitted)).

[75] *Id.* at 460 ("The parties involved in a construction project rely on intricate, highly sophisticated contracts to define the relative rights and responsibilities of the many persons whose efforts are required—owner, architect, engineer, general contractor, subcontractor, materials supplier—and to allocate among them the risk of problems, delays, extra costs, unforeseen site conditions, and defects.  Imposition of tort duties that cut across those contractual lines disrupts and frustrates the parties' contractual allocation of risk and permits the circumvention of a carefully negotiated contractual balance among owner, builder, and design professional." (citations omitted)).

example of an "intimate relationship" would be a complex construction contract involving various sub-contractors may need to rely on another sub-contractor while not being in privity with them.[76]

Here, the entire relationship between the Moon Entities and Kore is governed by a contract, and the Moon Entities' remedies are restricted to breaches thereunder.  Consequently, there are no factual allegations that could make this claim plausible as against Kore.  Therefore, the Court will grant the Motion as to Counts IV and V.

### *v.    Promissory Estoppel*

In Count VI of the Amended Complaint, the Trustee asserts a claim for promissory estoppel alleging that Kore promised the Moon Entities it would grant draw requests "in order to meet the Moon Entities' ongoing cash-flow needs, and for a long period of time."[77]  The Trustee continues:

> The Moon Entities relied on Kore's promise to fund their Line of Credit draw requests in excess of the initial limits set forth in the Line of Credit, and in reliance thereupon the Moon Entities commenced and continued making advance requests in excess of the amounts allowed under the initial terms of the Line of Credit.[78]

The Trustee asserts that the Moon Entities relied upon Kore's willingness to overadvance the Line of Credit and when Kore refused to continue overadvancing, the Moon Entities were unable to satisfy their payroll obligations and eventually filed for bankruptcy protection.

Kore seeks to dismiss Count VI on two grounds, one factual and one legal.  Factually, Kore asserts that in the Waiver/Loan Modification, dated June 28, 2021, the Moon Entities

---

[76] *See, e.g., Council of Co-Owners Atlantis Condo., Inc. v. Whiting-Turner Contracting Co.*, 517 A.2d 336, 341 (Md. 1986)

[77] Amend. Compl. at ¶ 133.

[78] Amend. Compl. at ¶ 134.

acknowledged that they submitted a false borrowing base certificate to Kore, which caused the Line of Credit to become overadvanced.[79]  The Moon Entities agreed to cure the overadvances by certain deadlines or incur additional penalties in connection with the Waiver/Loan Modification, dated June 28, 2021.  Legally, Kore asserts that promissory estoppel is a quasi-contractual claim in equity in which there is no actual contract but circumstances are such that justice warrants that a contract be implied.  Kore argues that promissory estoppel cannot arise when there is an actual contract, as in this case.

The Trustee responds that its claim does not relate to the Waiver/Loan Modification, dated June 28, 2021, but rather to Kore's repeated agreement to increase the credit limit and the percentage of StoneMor receivables eligible for an advance under the Line of Credit.  The Trustee maintains that an express contract does not prevent quasi-contract claims if there is evidence of fraud or bad faith, evidence of recission, or when the express contract does not address the subject matter.

---

[79]  The June 28, 2021, Waiver/Loan Modification states:

> F. An Event of Default occurred under the [Security and] Loan Documents by reason of the Borrower's false reporting of $1,204,631.16 in accounts receivable.

> Section 3. Cure of Overadvance.  As a result of the Borrower's false reporting of accounts receivable, the Borrow is not in compliance with Section 2.9 of the [Security and] Loan Agreement.  If Borrower has not cured the failure to comply with Section 2.9 of the Loan Agreement by July 2, 2021, Borrower shall pay $10,000.00 to the Lender.  If Borrower has not cured the failure to comply with Section 2.9 of the [Security and] Loan Agreement by July 9, 2021, Borrower shall pay $2,000.00 to the Lender.

Adv. D.I. 26 (Defendant Kore Capital Corporation's Memorandum of Law in Support of Motion for Judgment on the Pleadings), Ex. 1 (Waiver/Loan Modification Agreement dated June 28, 2021) at Recital F and § 3.

As the Trustee asserts that its claim does not relate solely to the Waiver/Loan Modification, dated June 28, 2021, the Court will review the legal issue of whether there can be a quasi-contract claim against Kore.  Under Maryland law,

> [t]he general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests.  The reason for this rule is not difficult to discern.  When parties enter into a contract they assume certain risks with an expectation of a return. Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those expectations defeated.  As a result, they have no remedy under the contract for restoring their expectations.[80]

Although, "courts are hesitant to deviate from the principle of the rule and allow unjust enrichment claims only when there is evidence of fraud or bad faith, there has been a breach of contract or a mutual recission of the contract, when recission is warranted, or when the express contract does not fully address a subject matter."[81]  The Moon Entities assert that virtually all these exceptions exist in this case.

The Court respectfully disagrees.  As evidenced by the Waiver/Loan Modification, dated June 28, 2021, the parties' contract, the Line of Credit, addresses overadvances.  Overadvances were similarly discussed in the Revolving Credit Agreement.  The "fraud" asserted by the Trustee is the request by Kore to engage a "cash flow consultant" which the Moon Entities did not do. And Kore's decision not to advance following the Moon Entities' decisions not to engage a cash flow consultant (considered an alleged "retaliation" by the Trustee) is allowed by the discretionary

---

[80]  *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 607 (Md. 2000) (citations and quotation marks omitted).

[81]  *Id.* at 608–09 (footnotes and citations omitted).

nature under the Line of Credit.  The Moon Entities and Kore are sophisticated actors with the ability to negotiate and freely enter the Line of Credit.

Under Maryland law where a contract addresses the subject matter of the alleged breach, a quasi-contract cause of action cannot stand.  Consequently, the Court will grant the Motion as to Count VI of the Amended Complaint.

### vi.    *Violation of the Automatic Stay*

In Count VII of the Amended Complaint, the Trustee alleges that Kore is violating the automatic stay under section 362 of the Bankruptcy Code by virtue of Kore's post-petition pursuit of its lawsuit against StoneMor for diverting payments to the Moon Entities instead of Kore.

Kore argues that the automatic stay is inapplicable because StoneMor is not a debtor and the Moon Entities have not sought to extend the automatic stay to include non-debtor StoneMor.

The Trustee responds that there is identity between the Moon Entities and StoneMor such that an action against StoneMor is in essence an action against the Moon Entities; and that any judgment against StoneMor will be a finding of a judgment against the Moon Entities.  The Trustee also argues that the Kore-StoneMor Action is an attempt to exercise control over property of the Debtors' estates.

The basis for the Kore-StoneMor Action is a breach of contract claim wherein Kore asserts that StoneMor breached the StoneMor Agreement, a contract between the Moon Entities and StoneMor in which Kore is not a party.  Kore's rights in the StoneMor Agreement derive from the Line of Credit and its security interest in the Moon Entities' receivables.

At bottom, Kore maintains that the Kore-StoneMor litigation (claiming approximately $4 million) is for payments that StoneMor purportedly diverted from Kore and paid to the Moon Entities. Although Kore has been paid its principal and interest on the Line of Credit; it asserts that the Moon Entities owe Kore additional fees and expenses.[82] As Kore is (allegedly) owed less than $4 million, the different between what Kore is owed versus what Kore claims against StoneMor, is estate funds (the "Excess Estate Funds").[83] And by pursuing StoneMor for these Excess Estate Funds, Kore is exercising rights against the Moon Entities' estates assets. This is the basis for the alleged of violation of the automatic stay.

Section 362(a) of the Code operates to stay

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title. . . .[84]

"[T]he clear language of section 362(a) stays actions only against a 'debtor.'"[85] "It is universally acknowledged that an automatic stay of proceeding accorded by § 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to

---

[82] *See supra* n. 23.

[83] Kore agrees that it is owed less than what it is pursuing against StoneMor. *See* Adv. D.I. 36 (Plaintiff's Memorandum of Law in Opposition to Kore Capital Corporation's Motion for Judgment on the Pleadings) at Ex. 1 (Email from David Musgrave, counsel to Kore, to Greg Taylor, counsel to Trustee, dated Mar. 3, 2022) ("The simple fact is that StoneMor diverted $4,191,567.01 in payments from StoneMor to Moon after StoneMor received KORE's assignment notice, and KORE is entitled to recovery in that amount. The fact that KORE is owed at this point less than $4,191,567.01 only means that *KORE would have to pay over to the bankruptcy estate the difference between what KORE recovers and what KORE is owed*." (emphasis added)),

[84] 11 U.S.C. § 362(a)(1).

[85] *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 509 (3d Cir. 1997) (citations omitted).

the Chapter 11 debtor."[86]  "[C]ourts have extended the automatic stay to nonbankrupt codefendants in 'unusual circumstances.'    As the case law demonstrates, courts have found 'unusual circumstances' where 'there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.'"[87]

The Trustee relies on the Third Circuit's opinion in *McCartney v. Integra Nat. Bank North*[88] for the proposition that the stay should be extended to the Kore-StoneMor Action, *even though* the Moon Entities never sought extension of the stay.  In *McCartney¸* the bank (Integra) loaned money to a restaurant (Lamar's Restaurant & Lounge, Inc.), which was guaranteed by McCartney, an individual.   McCartney filed a voluntary petition under chapter 13 of the Bankruptcy Code and filed a motion to sell the restaurant's corporate property.  The parties agreed, along with court approval, that the bank could put the corporate property through a sheriff's sale to determine what deficiency, if any, McCartney, as guarantor, owed to the bank.   After the sheriff's sale, the bank filed a deficiency claim in McCartney's bankruptcy case.   Thereafter, McCartney objected to the bank's claim because the bank failed to file a petition to fix the fair market value of the property within six months of the sheriff's sale as required under Pennsylvania state law.  In excusing the bank's non-compliance with state law, the court held that there was no way for the bank to comply with the state law *without* violating the automatic stay because the

---

[86] *Lynch v. Johns-Manville Sales Corp.*, 710 F.2d 1194, 1196 (6th Cir. 1983).

[87] *McCartney*, 106 F.3d at 510.

[88] *McCartney*, 106 F.3d 506 (3d Cir. 1997).

bank would have had to name McCartney in order pursue its deficiency judgment action in state

court or risk discharging him as a loan guarantor.  In other words, McCartney was necessary for

any deficiency judgment action initiated by the bank.[89]  As a result, the court held that the

automatic stay was extended to enjoin the bank from complying the state statute's requirements.[90]

Here, the Line of Credit allows Kore to pursue claims to enforce the accounts owed to the

Moon Entities.[91]  Although the Moon Entities may need to participate in providing documentation

---

[89] *Id.* at 511.

[90] *Id.*

[91] *See* Amend. Compl., Ex. 1 (Revolving Credit Agreement) at §§ 4.5, 4.6, and 9.1:

> § 4.5: Borrower hereby irrevocably authorizes and appoints Lender, … to exercise all of the following powers …
>
> (e) to take or bring, in the name of Lender or Borrower, all steps, actions, suits or proceedings deemed by Lender necessary or desirable to enforce or effect collection of the Accounts;
>
> (f) to do all other acts and things as Lender may deem reasonable to protect or preserve Lender's interest under this Agreement or fulfill Borrower's obligations under the Agreement.
>
> § 4.6: "Lender will notify all Obligors of all Accounts that the Borrower has granted a security interest in the Accounts to the Lender and that payments and remittances are to be made directly to Lender or as otherwise directed by Lender. . . ."
>
> § 9.1:  . . . Lender may exercise the following rights and remedies upon the occurrence of an Event of Default:
>
> (a) Re-notice all Obligors to make all payments directly to Lender;
>
> (b) Take control of any funds or Proceeds generated by the Accounts, and reduce any part of the Borrower's Obligations to Lender in such order as Lender determines;
>
> (c) Demand, collect, convert, redeem, settle, compromise, receipt for, realize on, adjust, sue for, and foreclose on the Accounts, either in Lender's or Borrower's name, as Lender elects;
>
> (d) Declare all Obligations and Indebtedness of Borrower hereunder immediately due and payable and enforce payment and performance of such Obligations and Indebtedness
>
> . . .

Amend. Compl., Ex. 1 (Revolving Credit Agreement) at §§ 4.5, 4.6, and 9.1.

or fact witnesses, the Moon Entities are not a necessary party to the Kore-StoneMor Action.

Instead, Kore is "standing in the shoes" of the Moon Entities.  Just as the bank was forgiven from

actions that would violate the automatic stay in *McCartney*, there is nothing forcing Kore (or

StoneMor) from making the Moon Entities a party in the Kore-StoneMor Action, which would

implicate the automatic stay.  Furthermore, although the Moon Entities could have sought to

extend the stay to StoneMor, a non-debtor, third party, they did not.[92]

As such, the Court finds as a matter of law that Kore did not violate the automatic stay by

pursuing its contractually granted claims against StoneMor.  The Line of Credit affords Kore the

remedy of pursuing claims against Moon Entities' customers.  Therefore, it is not plausible that

Kore violated the automatic stay by pursuing a claim against a non-debtor third party pursuant to

the terms of the Line of Credit.

However, it is plausible that Kore's pursuit of the Excess Estate Funds is a violation of the

automatic stay because Kore is exercising rights over estate property.[93]  Property of the estate is

defined in section 541 as "all legal or equitable interests of the debtor in property as of the

commencement of the case."[94]  "It is well settled law in the Third Circuit that section 541(a)(1)

---

[92] In order for Kore to violate the automatic stay, Kore would have to (i) know about the automatic stay and (ii) take intentional actions in violation of the stay.  *Cuffee v. Atl. Bus. & Cmty Corp. (In re Atl. Bus. & Cmty. Corp.)*, 901 F.2d 325, 329 (3d Cir. 1990) (citations and internal quotation marks omitted) (holding "the statute provides for damages upon a finding that the defendant knew of the automatic stay and that the defendant's actions which violated the stay were intentional.").  Moon was protected by the automatic stay.  Moon never extended the stay as to the Kore-StoneMor Action, such that there is not a plausible scenario where Kore could have willfully violated such alleged stay.

[93] *True Health Diagnostics LLC v. Azar (In re THG Holdings LLC)*, 604 B.R. 154, 160 (Bankr. D. Del. 2019) (*quoting* 11 U.S.C. § 362(a)) ("Section 362 states that "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case" is subject to the automatic stay.").

[94] 11 U.S.C. § 541(a)(1).

was intended to sweep broadly to include all property whether tangible, intangible, contingent, or postponed, because the mere opportunity to receive an economic benefit in the future is property with value under the Bankruptcy Code."[95]   As a result, any funds collected from StoneMor in excess of the amount owed to Kore, would be estate funds and Kore cannot pursue those estate assets without (potentially) violating the automatic stay.

For the foregoing reasons, the Court will deny the Motion as to Count VII as to the Excess Estate Funds and will not dismiss Count VII of the Amended Complaint as a matter of law.

**D.      Release of Claims**

Kore also asserts that the Waiver/Loan Modification, dated June 28, 2021, contains a release of all claims against Kore for all actions taken prior thereto.[96]   The Trustee asserts that all their causes action incurred after June 28, 2021, and were, thus, not released.  As a matter of law, the Court holds that all the claims in the Amended Complaint will be dismissed (other than Count VII), so the Court need not examine when the claims incurred.

---

[95]   *In re THG Holdings LLC*, 604 B.R. at 160 (citations and internal quotation marks omitted).

[96]   *See* Adv. D.I. 26 (Defendant Kore Capital Corporation's Memorandum of Law in Support of Motion for Judgment on the Pleadings), Ex. 1 (Waiver/Loan Modification, dated June 28, 2021 at § 10 (<u>Release</u>.  To induce the Lender to enter into this Modification, the Borrower and the Guarantor release, remise, acquit and forever discharge the Lender and each of its employees, agents, directors, officers, attorneys, successors and assigns, from any and all matters or claims, actions, causes of action, suits, debtors, agreements, and demands whatsoever, whether known or unknown, at law or in equity, or otherwise which the Borrower or the Guarantor ever had, now have, or shall have against the Lender by reason of any cause, matter or thing whatsoever existing or done from the beginning of time to the execution date of this Modification.")).

The release, however, does not affect Count VII for violation of the automatic stay because as of the date of the oral argument in this matter (September 21, 2022),[97] Kore was continuing to pursue StoneMor in the Kore-StoneMor Action.

## E.    Leave to Amend would be Futile

At oral argument, Trustee alleged that facts were developed in discovery that amplified the claims in the Amended Complaint.  Trustee suggested a willingness to amend the Amended Complaint to bolster Trustee's claims.[98]

Rule 15(a) of the Federal Rules of Civil Procedure, made applicable in this adversary proceeding by Rule 7015 of the Federal Rules of Bankruptcy Procedure, requires that leave to amend a pleading be "freely given when justice so requires."  The Supreme Court has held that leave should be "freely given" by the courts in the absence of any "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."[99]  "Futility of amendment exists when the claim or defense is not accompanied by a showing of plausibility sufficient to present a triable issue.  Thus a trial court may appropriately deny a motion to amend where the amendment would not withstand a motion to dismiss."[100]

---

[97]  Adv. D.I. 78 (Tr. of Hr'g (Sept. 21, 2022) at 9:12-14 (The Court: . . . "so the action is still being pursued in the Eastern District of Pennsylvania?" Kore's counsel: "Yes, it is.")).

[98]  *See supra* fn. 19.

[99]  *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962).

[100]  *PCT v. Authentic Specialty Foods, Inc. (In re Fleming Companies, Inc.)*, 347 B.R. 163, 167–68 (Bankr. D. Del. 2006) (citations omitted).

Here, the Trustee's proposed amendments would be futile.  The Line of Credit states that Kore had discretion to make (or not make) advances, to sue StoneMor, to redirect the mail, and to contact the Moon Entities' customers.  No further factual allegations would alleviate these contractual provisions.  As a result, a request to amend the Amended Complaint is pointless.

<u>**CONCLUSION**</u>

For the reasons set forth above, the Court will grant the Motion, in part, and deny the Motion, in part.  An order will be issued.

Dated:  September 30, 2022

_____
J. Kate Stickles
United States Bankruptcy Judge